IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FACEBOOK ACCOUNT:<br><br>100023088490579<br><br>THAT ARE STORED AT PREMISES CONTROLLED BY FACEBOOK, INC | Case No. 4:21mj2 _____<br><br>**FILED UNDER SEAL** |

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION FOR SEARCH WARRANT**

I, Devin Taylor, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant for information associated with the Facebook account number **100023088490579** with Facebook username of "Steffy May" that is stored at a premise owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession pertaining to the subscriber or customer associated with the user ID, including the content of the subscriber's or customer's account.

1. I am an "investigative or law enforcement officer" of the United States within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of, and to make arrests for, offenses in violation of Title 18 and Title 21 of the United States Code.

2. I am an Investigator with the Pittsylvania County Sheriff's Office based in

Chatham, Virginia. I have been a Task Force Officer with the Federal Bureau of Investigation ("FBI") since October 2016 and currently work in that capacity while employed with the Pittsylvania County Sheriff's Office. Prior to serving in the role of an Investigator, I served as a Deputy Sheriff employed by the Pittsylvania County Sheriff's Office. Prior to my appointment to Deputy Sheriff and then promotion to Investigator, I served as a crime analyst with the Pittsylvania County Sheriff's Office, where my duties encompassed analyzing digital records from cellular devices, to include search warrant returns from various social media platforms.

3. I have had extensive training at the Piedmont Regional Criminal Justice Training Academy, where I completed entry level law enforcement training and hold a Virginia Law Enforcement Certification. I am also a certified Instructor with the Piedmont Regional Criminal Justice Training Academy, which allows me to teach Virginia Department of Criminal Justice Services curriculum to upcoming officers enrolled in training academies in the Commonwealth of Virginia.

4. I have also been trained on the investigative use of cellular and other electronic devices, to include performing forensic examinations on such devices and I hold numerous certifications in this subject area. In addition, I have extensive training in cyber crimes, hold numerous certifications regarding cyber and digital investigations, and have conducted numerous cyber investigations with a focus on social media, specifically Facebook.

5. During my career as a law enforcement officer, I have authored numerous affidavits in support of state search warrants, criminal complaints, and arrest warrants. As a TFO with the FBI, I have authored affidavits in support of federal criminal complaints and search warrants.

6. In addition, I have participated in numerous criminal investigations focused on firearms, drug trafficking violations, criminal street gangs, human trafficking, cyber security, and

national security cases. I have had training on violations of Title 18, United States Code, Section 1961 *et seq.* (Racketeer Influenced and Corrupt Organizations Act); Title 18, United States Code, Section 1959 *et seq.* (Violent Crimes in Aid of Racketeering); Title 18 United States Code, Section 921 *et seq.* (Firearms); and Title 21, United States Code, Section 841 *et seq.* (Drug Offenses); Title 18, United States Code, Section 1591 (Sex Trafficking of Children); Title 18 United States Code, Section 2423 (Transportation of Minors).

7. The facts in this affidavit come from my personal observations, my training and experience, my review of electronic media obtained pursuant to state search warrants, as well as information obtained from other law enforcement officers and in interviews with witnesses. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

8. Based on the facts set forth in this affidavit, there is probable cause to believe Amy Williams and Joshua Voges committed violations of Title 18 U.S.C. §§ 1591(a)(1)(2) and 2423, sex trafficking of a minor and transportation of a minor with intent to engage in criminal sexual activity. There is also probable cause to believe that evidence of these crimes will be stored withinthe information described in Attachment A, as described in Attachment B.

## TECHNICAL BACKGROUND ON FACEBOOK

9. Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users and sometimes with the general public.

10. Facebook asks users to provide basic contact and personal identifying

information to Facebook during the registration process or later. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

11. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

12. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

13. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming

"events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

14. Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

15. Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

16. If a Facebook user does not want to interact with another user on Facebook, the

5

first user can "block" the second user from seeing his or her account.

17. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

18. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

19. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

20. Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

21. The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

22. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

23. In addition to the applications described above, Facebook also provides its users

with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

24. Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

25. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

26. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like

Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

27. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element of an offense or, alternatively, to exclude the innocent from further suspicion. The "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geolocation into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "Friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the

Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

28.     Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## PROBABLE CAUSE

29.     The Federal Bureau of Investigation (FBI) is conducting a criminal investigation into the sex trafficking of a minor, S.A., in violation of 18 U.S.C. §§ 1591(a)(1)(2) and §2423. S.A. resides in the Western District of Virginia.

30.     On December 9, 2020, the Federal Bureau of Investigation received police reporting and other information from the Pittsylvania County Sheriff's Office describing allegations made by S.A. that she had been the victim of sex trafficking. S.A. had recently been removed from the custody of her mother and placed into foster care.

31.     A Child Adolescent Forensic Interview (CAFI) was conducted by the FBI on December 12, 2020. During the interview, S.A. reported that at the direction of her mother, d Amy Williams, and Williams' boyfriend, Joshua Voges, she had engaged in sex acts with adult males in exchange for a payment of narcotics. S.A. reported that Voges threatened violence if she did not perform the sex acts. S.A. further reported that the commercial sex acts were arranged by Amy Williams. S.A. described hotels and residential houses where the alleged sex acts had occurred, as well as individuals with whom she had engaged in commercial sex acts. S.A. reported that she had engaged in commercial sex acts arranged by Williams and Voges in at least three states, North

9

Carolina, Tennessee, New York as well as Virginia. . S.A. further reported she had been sexual abused since the age of 10.

32. A follow up interview of S.A. was conducted on January 12, 2021. During the interview S.A. drafted a handwritten note of social media accounts she had used during the timeframe she had been trafficked. . S.A. provided verbal consent to search and review the contents of her accounts, but further explained that Williams also had control of her social media accounts. Specifically, S.A. identified the username of "Steffy May" as being one of her Facebook accounts, to which Williams also had access. S.A. further reported that she believed Williams used that account to arrange commercial sex acts for S.A. FBI has identified the account "Steffy May" as bearing the Facebook account number of 100023088490579.

33. On January 13, 2021, your affiant conducted interview of Amy Williams. During the course of the interview, Williams stated that she had knowledge that S.A. had been sex trafficked, but claimed that Josh Voges had directed and arranged most of the transactions. Williams further confirmed that S.A. had numerous social media accounts and that Voges used S.A.'s social media accounts, for the purposes of sex trafficking and solicitation of illegal and prescription drugs.

34. Williams further acknowledged her involvement with Voges in prescription drug fraud. Williams and Voges engaged in a scheme whereby Williams would pick up prescription drugs prescribed to S.A. and re-sell the drugs for money.

35. Based upon the information outlined above, there is probable cause that to believe that Voges and Williams utilized the above-captioned Facebook account in furtherance of the sex trafficking of S.A. Your affiant has preserved the business records of this account and verified the account current status as being active.

36. Therefore, it is respectfully submitted that probable cause exists that the data maintained and stored at the premises of Facebook associated with the Facebook user Steffy May will lead to evidence, fruits, or instrumentalities of the crime described above and could assist in identifying additional witnesses and suspects that are involved in prescription drug fraud and sex trafficking schemes..

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

37. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1) (A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## JURISDICTION

1. This Court has jurisdiction to issue the requested warrant because it is a "court of competent jurisdiction" as defined by 18 U.S.C. § 2711. Specifically, this Court is a "district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## CONCLUSION

2. Based on the foregoing, I request that the Court issue the proposed search warrant.

3. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Respectfully submitted,

11

_____
Devin Taylor
Task Force Officer
Federal Bureau of Investigation

Subscribed and sworn to before
me on January 26, 2021:

*Robert S. Ballou*
_____
UNITED STATES MAGISTRATE JUDGE